**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **LULU SHRINERS**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 20-1720-KSM** |
| **TOWNSHIP OF WHITEMARSH,** et al., | |
| Defendants. | |

**MEMORANDUM**

**Marston, J.**                                                                                    **August 31, 2021**

Plaintiff LuLu Shriners has sued Whitemarsh Township, the current members of the

Township Board of Supervisors,[1] and Township Manager, Richard Mellor Jr. (the "Township

Defendants"), along with Township Solicitor, Sean Kilkenny,[2] for the enactment of Ordinance

No. 995, which prohibits the display of wild and exotic animals within the Township.  Shriners

argues that the ordinance is an unconstitutional bill of attainder because it targets Shriners for

including large cat and elephant shows at its annual circus.  Shriners also argues that the

ordinance unlawfully interferes with its contract with Hamid Entertainment Group, LLC, the

subcontractor that supplies the acts and wild animals for the circus.  The Township Defendants

and Solicitor Kilkenny have each filed a motion to dismiss the complaint in its entirety.  For the

reasons discussed below, those motions are granted.

---

[1] The current Board members are Michael Drossner, Vincent Manuele, Laura Boyle-Nester, Fran McCusker, and Jacy Toll.

[2] Shriners also names Doe Defendants 1–99, who are "administrators/and [sic] or employees in the Township of Whitemarsh who aided and/or assisted in the drafting and development of Ordinance No. 995."  (Doc. No. 15-2 at p. 7 ¶ 7.)

## I.      *Factual Background*

LuLu Shriners is a national fraternal and philanthropic organization that supports

Shriners Hospitals for Children across the United States.  (Doc. No. 15-2 at p. 6 ¶ 1.)  For more

than 47 years, the local fraternity, referred to as a "Temple," in Whitemarsh Township,

Pennsylvania, has put on a circus as a fundraiser for the hospitals.  (*Id.* at p. 6 ¶ 2; *see also* Doc.

No. 8 at p. 22.)  To that end, in 2016, Shriners contracted with Hamid Entertainment Group, LLC

to produce, stage, and direct Shriners' 2017 circus, which was to include, among other things,

colorful and lighted ring curbs and floor coverings, theatrical lighting, a ringmaster, a finale act

(e.g., cannon, globe of death, cybertron), a quality wild animal attraction (e.g., tigers, lions), a

top-quality elephant act, ground and aerial production numbers, clowns, and a band leader with

complete music.  (Doc. No. 15-2, Ex. D, Circus Contract at pp. 26–27; *see also id.* at p. 30

("CIRCUS shall provide elephant rides . . . .").)  The parties later extended the term of the

contract from one year to four years, which meant Hamid Entertainment would produce the

Shriners' circus in May 2017, 2018, 2019, and 2020, at a base rate of $41,000 per year.  (*Id.* at p.

34.)

Since approximately 2013, the Whitemarsh Township Board of Supervisors has received

requests from residents and activists to prohibit the types of traveling animal acts on display at

the Shriners' circus.[3]  (*Id.* at p. 8 ¶ 4; *see also id.* Ex. A, Aug. 8 Twp. Meeting Video ("Aug. 8

Video") at 2:22:43 ("This is a response to the public's request to prohibit this type of animals

[sic] being displayed specifically here in Whitemarsh Township at the LuLu Shriners annual

circus.").)  In response to these requests, the Board asked Solicitor Kilkenny to draft an

ordinance prohibiting the display of wild and exotic animals within the Township.  (*Id.* at p. 8

---

[3] These requests were first made years before Shriners contracted with Hamid Entertainment in 2016.

¶ 4; *see also* Aug. 8 Video at 2:22:43.)  The draft ordinance was discussed at three public meetings of the Board of Supervisors.[4]

### A.      August 8, 2019 Township Meeting

The Board first discussed Ordinance No. 995 at a meeting on August 8, 2019.  (*Id.* at p. 8 ¶ 3; *see also* Aug. 8 Video at 2:22:00.)  During the meeting, Supervisors Grossman and Drossner explained that the ordinance was meant to both protect wild animals from abuse and protect the public from the potential danger of the animals breaking free.  (*See, e.g.*, Aug. 8 Video at 2:25:00 (Drossner describing a recent incident in Colorado where a steer escaped and ran through a crowd).).  Supervisor Grossman also introduced Gigi Glendening, a member of the People for the Ethical Treatment of Animals ("PETA") and resident of a neighboring township,[5] and emphasized the pivotal role Glendening played in bringing about the ordinance.  (*See id.* at 2:24:30.)

During the public comment period, Glendening spoke in support of the draft ordinance but requested that it be revised to remove any exemptions for "rodeos."  (*Id.* at 2:26:45 (suggesting that rodeo animals be exempted instead of rodeo events).)  Glendening expressed her fear that Shriners and others would use the rodeo[6] exemption to continue using exotic animals despite the ordinance's prohibition:  "I also kind of fear that the Shriners might see [the rodeo

---

[4] The Board of Supervisors changed between the second hearing and the third hearing.  For the August and September 2019 hearings, the Board of Supervisors included Missy Sterling, Amy Grossman, Michael Drossner, Laura Boyle-Nester, and Fran McCusker.  (*See* Aug. 8 Video; *see also* Doc. No. 15-2, Ex. B, Sept. 12 Twp. Meeting Video ("Sept. 12 Video").)  For the January 2020 hearing, the Board of Supervisors consisted of  Michael Drossner, Vincent Manuele, Laura Boyle-Nester, Fran McCusker, and Jacy Toll.  (*See* Doc. No. 15-2 at p. 6, ¶ 4; *see also id.*, Ex. C, Jan. 6 Twp. Meeting Video ("Jan. 6 Video").)  As mentioned above, only the latter supervisors have been named in this lawsuit.

[5] Glendening does not live in Whitemarsh Township, but for more than six years, she has nonetheless been spearheading a campaign to have the Township Board of Supervisors ban animal acts like those at the Shriners' circus.  (*Id.* at p. 9 ¶ 8; *see also* Aug. 8 Video at 2:24:30–2:26:20.)

[6] Shriners' rodeo appears to be a distinct event from the Shriners' circus.

exemption, or] use their rodeo event to offer elephant rides . . . [because the elephant shows] travel independently of circuses.  Even tiger acts are starting to travel independently of the circus tent." (*Id.*)  She then described recent events across the country where members of the public were harmed by wild animals traveling in similar shows.  (*Id.* at 2:27:00 (describing an incident in Pensacola, where an employee left the door open on a tiger cage at a fair); Doc. No. 15-2 at p. 9 ¶¶ 7, 9.)

After Glendening spoke, Maryanne Bessey, an animal advocate, voiced her support for the ordinance, discussing her many years of protesting animal circuses, including those sponsored by Ringling Brothers, Cole Brothers, and LuLu Shriners.  (Aug. 8 Video at 2:33:25.) Bessey noted that there was "so much support for this [type of ordinance], even within Shriners," referencing other Shriners' clubs that no longer used animal acts, and numerous other jurisdictions and venues that had implemented wild animal bans because they are "so dangerous to the public [and] so cruel to animals." (*Id.* at 2:34:30–2:37:45; *see also id.* at 2:36:30 ("Even Shriners are [banning animal acts], so you can't say that this is just something that's going to effect the Shriners; they're not going to be able to do their fundraiser.  No.  There's other Shriners that are doing that.").)

At the close of public comments, the Board voted in favor of holding a public hearing on Ordinance No. 995, which would be held on September 12, 2019.  (Doc. No. 15-2 at p. 8 ¶ 3; *id.* at p. 9 ¶ 12; *see also* Aug. 8 Video at 2:38:35.)  The Township did not notify Shriners about the ordinance or the August meeting before it occurred.  (Doc. No. 15-2 at p. 9 ¶ 11.)  However, during the meeting, Township Manager Mellor stated that a copy of the draft ordinance would "be given to LuLu.  I mean, they are the most impacted and they'll be notified of the public hearing." (Aug. 8 Video at 2:29:00.)

### B.      *September 12, 2019 Township Meeting*

On September 12, 2019, the Board of Supervisors held a public hearing on Ordinance

No. 995.  The ordinance's official title is:

> AN ORDINANCE OF THE TOWNSHIP OF WHITEMARSH, MONTGOMERY
> COUNTY, PENNSYLVANIA, AMENDING THE CODE OF ORDINANCES OF
> WHITEMARSH TOWNSHIP TO ADD PROVISIONS TO PROTECT THE
> PUBLIC FROM HAZARDS ASSOCIATED WITH TRAVELING WILD OR
> EXOTIC ANIMAL DISPLAYS AND TO PROTECT WILD AND EXOTIC
> ANIMALS FROM CRUEL AND INHUMANE TREATMENT; REPEALING
> ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING A
> SEVERABILITY CLAUSE; AND PROVIDING AN EFFECTIVE DATE.

(Doc. No. 15-2 at p. 10 ¶ 13; *see also* Sept. 12 Video at 0:05:12.)  Although the Township Code

requires publication and notice before the Board can vote on an amendment (*see* Doc. No. 15-2

at p. 10 ¶ 15), Ordinance No. 995 was not posted on the Township website or published in a

newspaper of general circulation (*id.* at p. 10 ¶ 14; *see also* Sept. 12 Video at 0:08:38 (resident

noting that the ordinance "is not posted on the Township website")).  Instead, Shriners received

notice of the September 12th hearing via regular mail and only learned of the hearing a few

hours before it began.  (*Id.* at p. 10 ¶ 16; *see also* Jan. 6 Video at 0:20:07.)

During the September 12th hearing, Board Manager Mellor once again noted the "many

years" of requests to ban wild and exotic animal displays.  (Sept. 12 Video at 0:5:50:00.)  He

also explained that the supervisors and Solicitor Kilkenny had considered and agreed with

Glendening's request to remove an exemption for rodeos, which meant "rodeos are are [sic] no

longer exempt from the provisions of this ordinance."  (*Id.* at 0:06:10.)  The hearing then opened

for public comment.

Glendening spoke again in support of the ordinance, touting it as a means to stop animal

cruelty and protect the public.  (*Id.* at 0:09:41 (stating that she has "been documenting the animal

suffering and inherent public safety risk at LuLu Shrine Circus since 2012" and explaining that

5

she has met with Shriners multiple times with numerous experts and has documentation of the animal abuse and danger to the public related to traveling animal acts).)  In particular, Glendening discussed the danger that traveling exotic animal displays pose to the public, describing events in Russia, China, and Sri Lanka that had occurred within the previous two weeks.  (Doc. No. 15-2 at p. 10 ¶ 17; *see also* Sept. 12 Video at 0:10:45.)

Veterinarian Joan Capuzi also spoke during the hearing.[7]  She described the danger that traveling animal shows and circuses pose to the public and the harm that they pose to large wild animals, including "wild cats, elephants, bears, and primates."  (Doc. No. 15-2 at p. 11 ¶ 19; Sept. 12 Video at 0:13:20; *id.* at 0:14:01 (saying that as a veterinarian she sees "no humane place" for these types of shows).)  Among other things, Capuzi detailed how these acts interfere with the normal elephant life cycle.  (*Id.* at 0:15:37.)  She then showed the Board a scratch on her arm from a domesticated cat and told them to imagine what a wild tiger might do to someone if it escaped.  (Doc. No. 15-2 at p. 11 ¶ 19; *see also* Sept. 12 Video at 0:18:10.)  Finally, she noted that hundreds of jurisdictions — countries, states, and municipalities — have implemented bans similar to Ordinance No. 995.  (Sept. 12 Video at 0:20:16.)

No one from Shriners attended the hearing.  And at the end of the public comment period, the Board of Supervisors voted unanimously to adopt Ordinance No. 995.  (*Id.* at 0:21:05.)

### C.    *Ordinance No. 995*

In its final form, Ordinance No. 995 makes it "unlawful for any person to cause or permit the display of any wild or exotic animal on any public or private property within the corporate boundaries of Whitemarsh Township."  Whitemarsh Twp., Pa., Code § 39-18; *see also id.* § 39-

---

[7] Capuzi is a small animal veterinarian, a member of Radnor Township's Board of Health, and a member of the institutional review board at Haverford College.  (Sept. 12 Video at 0:13:28.)

17 (defining "wild or exotic animal" to include camels, monkeys, non-domestic cats, and elephants).  Permanent accredited zoos and aquariums, accredited wildlife sanctuaries, veterinarians, and USDA-registered schools and research facilities are exempt from the restriction.  *Id.* § 39-19.  The ordinance is "enforced by the Police Department and the Code Enforcement Officer of Whitemarsh Township," *id.* § 39-20, and "[a]ny person or other entity" who violates any provision of the ordinance shall "upon conviction by a Magisterial District Judge, be sentenced to pay a fine not to exceed $1,000, plus court costs and the Township's actual attorneys' fees, and, in default of payment of such fine, costs, and fees, to imprisonment for a term not exceeding 30 days," *id.* § 39-21.  The listed purpose of the ordinance is to "protect the public against hazards associated with traveling wild or exotic animal displays, and to protect wild and exotic animals from cruel and inhumane treatment."  Ordinance No. 995, Whitemarsh Twp., Pa.  (*See* Doc. No. 2, Ex. B, Ordinance No. 995 at p. 69.)

### D.      *January 6, 2020 Township Meeting*

On January 6, 2020, a newly elected Board of Supervisors considered an amendment to Ordinance No. 995, entitled Ordinance 2019-01, which would prohibit rodeos in Whitemarsh Township.[8]  (Doc. No. 15-2 at p. 11 ¶ 21; *see also* Jan. 6 Video at 0:17:14.)  Shriners' attorney, Damian Sammons, attended this meeting along with other members of the Shriners' club.  Sammons argued that the amendment, like the entirety of Ordinance No. 995, was an unconstitutional bill of attainder, in that it singled out and punished Shriners as the only organization to host a circus in the Township.  (Jan. 6 Video at 0:18:14.)

---

[8] At the September 12th hearing the Board removed a provision from Ordinance No. 995, which would have exempted rodeos from the ban on exotic animals.  Ordinance 2019-01 appears to go one step further by seeking to prohibit rodeos altogether.

Supervisor Drossner responded that Ordinance No. 995 "was not just focused on LuLu Shriners."  (Doc. No. 15-2 at p. 11 ¶ 22; *see also* Jan. 6 Video at 0:25:10.)  Although Drossner recognized that the ordinance had "an effect on the LuLu Temple" and required that they "find other ways to fundraise," he noted that "there are many ways to raise funds.  Using wild animals, exotic animals on display is not the only way to raise money."  (Doc. No. 15-2 at p. 12 ¶ 24; *see also* Jan. 6 Video at 0:25:55.)  Drossner also explained that while Ordinance No. 995 "primarily" affects Shriners, it "also affects other people that might want to have a rodeo or a circus . . . anywhere else in our Township."  (Jan. 6 Video at 0:25:10.)  Solicitor Kilkenny likewise emphasized that the ordinance is "a law of general applicability" that applies to "anybody within the Township," and does not punish any one entity based "on how they operate or don't operate." (*Id.* at 0:29:44.)

Drossner then described the Board's process for enacting Ordinance No. 995, explaining that the supervisors deliberated and reviewed video and photographic evidence "from all over the country and right around the time that [the supervisors] finally voted on it," they saw a video of a bull that "got loose . . . and it was running around the town square filled with hundreds of people, children, adults.  It was dangerous.  It was scary.  And it was unnecessary."  (*Id.* at 0:25:30.) Based on this evidence, the supervisors passed the ordinance as a proactive measure to protect the public and exotic animals from future harm.  (*See id.* at 0:27:27 ("Well we shouldn't wait until some kid gets run over by a bull should we, Damian? . . . Don't we have to be proactive and say hey, there's a potential issue here and we should do something about it?"); *id.* at 0:27:37 (a second supervisor agreeing that Ordinance No. 995 was passed as a proactive measure).) Sammons continued to protest the ordinance, emphasizing that the supervisors had no evidence

that any member of the public or wild animal had ever been harmed during *Shriners' circus*.  (*Id.* at 0:27:13.)

After additional discussion, the Board of Supervisors voted to table Ordinance 2019-01. (Doc. No. 15-2 at p. 12 ¶ 27.)  Ordinance No. 995, however, remains in effect and as passed, prohibits Shriners from showcasing elephants, large cats, and other wild animals at its annual circus.

## II.    *Procedural History*

On March 5, 2020, Shriners sued Defendants in the Court of Common Pleas of Montgomery County, Pennsylvania, contending that Ordinance No. 995 is an unconstitutional bill of attainder that singles out and punishes Shriners for having wild and exotic animal acts at its annual circus.  (*Id.* at p. 13 ¶ 32.)  Shriners' complaint asserts two counts, one for an injunction that prohibits the Township from enforcing Ordinance No. 995, and one for tortious interference with business contracts.  (*See generally id.*)  Defendants removed the case to this Court, arguing Shriners' complaint raises a constitutional claim that Ordinance No. 995 is an unlawful bill of attainder.[9]  (*See* Doc. No. 1.)  The Township Defendants filed a motion to dismiss the complaint in its entirety.  (Doc. No. 2.)  The remaining Defendant, Solicitor Kilkenny, has also filed a motion to dismiss.  (Doc. No. 7.)  After an initial pretrial conference,[10] the Court stayed discovery pending a ruling on the motions to dismiss.  (Doc. No. 12.)

---

[9] As discussed further below, we agree with the Township Defendants that Shriners' complaint raises a constitutional claim and therefore, we have federal question jurisdiction.  Although Shriners frames Count I as being for injunctive relief, it alleges a constitutional injury:  that Ordinance No. 995 is a bill of attainder that violates Shriners' federal constitutional rights.  And although it is not dispositive, we note that Shriners essentially conceded that we have jurisdiction when it failed to file a motion to remand or otherwise raise a jurisdictional challenge in its response to the Township Defendants' motion to dismiss.

[10] While the case was in state court, Shriners filed an Emergency Petition for Preliminary Injunction.  (*See* Doc. No. 8 at p. 13.)  During the pretrial conference with this Court, counsel for Shriners

### III.      Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*; *see also Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (explaining that the court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from those allegations).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. at 678.  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  The exception to this rule is that a court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011) (quotation marks omitted).  Because the recordings of the Township meetings are matters of public record, and Shriners attached them as exhibits to its complaint, the Court may consider those recordings in deciding the pending motions to dismiss.  *See id.*; *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d

---

agreed to withdraw the request for a preliminary injunction without prejudice, in light of Covid-19 restrictions preventing public gatherings in Pennsylvania.

28, 32 (3d Cir. 2011) (explaining that the court may "consider documents attached to the complaint" in weighing a motion to dismiss).

## IV.    *Discussion*

The Township Defendants and Solicitor Kilkenny move to dismiss Shriners' complaint in its entirety.  (*See generally* Doc. Nos. 2 & 7.)  First, the Township Defendants argue that Shriners' claim for injunctive relief (Count I) fails, because Ordinance No. 995 is not an unconstitutional bill of attainder and Shriners has not demonstrated that an injunction is an appropriate remedy.  (Doc. No. 2 at pp. 9–19.)  Next, all Defendants argue that Shriners' claims for tortious interference with contractual relations (Count II) fail because the complaint lacks sufficient facts to state a claim, and in the alternative, Defendants are entitled to immunity under Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA").  (*See id.* at pp. 19–25; Doc. No. 7 at pp. 2–5.)

Shriners does not substantively respond to Defendants' argument that Count I fails because the complaint lacks any facts that suggest Ordinance No. 995 is an unconstitutional bill of attainder.  Shriners claims this lapse was purposeful:  "Plaintiff did not file a Constitutional Claim against Defendants.  Plaintiff filed an Injunction in state court against Defendants on grounds that the law that Defendants passed was both illegal and unconstitutional.  This is not nuance."  (Doc. No. 10 at p. 2.)  Shriners argues that it did not need to include an underlying constitutional claim because a claim for injunctive relief is an independent cause of action. (*Id.* (asserting that an "injunction is an actual and recognizable cause of action").)  We disagree.

Numerous cases from this Circuit hold that an injunction is a *remedy*, not a cause of action.  *See, e.g.*, *Herley Indus. Inc. v. R Cubed Eng'g, LLC*, No. 5:20-cv-02888, 2021 WL 229322, at *5 (E.D. Pa. Jan. 22, 2021) ("[P]reliminary and permanent injunctions are a form of

relief, not a claim to be pleaded as a separate count."); *In re Shop-Vac Mktg. & Sales Pracs. Litig.*, 965 F. Supp. 2d 355, 365 (M.D. Pa. 2013) ("Defendants are correct that injunctive relief is a remedy, not an independent cause of action."); *Teri Woods Pub., LLC v. Williams*, Civil Action No. 12–04854, 2013 WL 1500880, at *4 (E.D. Pa. Apr. 12, 2013) ("[The defendant] contends that a permanent injunction does not constitute a separate cause of action as it is a request for equitable relief, and that an injunction is not applicable where other claims asserted in the action demonstrate an adequate remedy at law.  Defendant is correct in these assertions.").

Indeed, the standards for preliminary and permanent injunction require that the plaintiff demonstrate either a likelihood of success or actual success on the merits of an underlying claim. *See Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 215 n.9 (3d Cir. 2014) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987))); *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001) (explaining that the moving party must show "actual success on the merits" to obtain a permanent injunction); *Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 84, 850 (3d Cir. 1984) ("In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof).  If so, the court must then consider the appropriate remedy.").[11] Therefore, even though Shriners did not assert a separate constitutional count, it must still allege

---

[11] Shriners cites to state law, instead of federal, throughout its response brief.  But when analyzing whether Shriners is entitled to an injunction, we apply a federal, not state, standard.  *Cf. Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989) ("We utilize a federal standard in examining requests to federal courts for preliminary injunctions."); *CLP Assocs., LLC v. Seneca Ins. Co.*, Civil Action No. 20-1409, 2020 WL 6047172, at *3 n.2 (W.D. Pa. Oct. 13, 2020) ("Because this case was removed from state court and the Court's jurisdiction is predicated on diversity of citizenship, it bears noting that the Court is to use a federal standard with regard to the preliminary injunction analysis.").

facts that support a finding that there has been an underlying unlawful act, for which injunctive relief is warranted.

Although Shriners acknowledges this merits analysis in its complaint (*see* Doc. No. 15-2 at p. 14 ¶ 35iv. ("LuLu Shriners is likely to prevail on the merits of its case against the Township of Whitemarsh because direct evidence . . . is both available to the public and attached, hereto, Exhibits A–C.")), it fails to provide any analysis on this issue in its briefing on the motion to dismiss.  Instead, Shriners states vaguely that it seeks an injunction to prevent "Defendants from enforcing an illegal, arbitrary, capricious and unfounded ordinance" (*id.* at p. 3), without any explanation as to why the ordinance is "illegal."  It does not, for example, discuss the standard for a bill of attainder or explain why Ordinance No. 995 satisfies that standard.  (*See, e.g.*, Doc. No. 8 at p. 20 (stating in a conclusory fashion that "Defendants ordinance was arbitrary, unsubstantiated and unconstitutional" and "Plaintiff has a clear right to injunctive relief under both state and federal law").)  We could dismiss Count I for this error alone.  *See Herley Indus. Inc.*, 2021 WL 229322, at *5 (dismissing counts for injunctive relief with prejudice).

However, in an abundance of caution, we will review the complaint to see whether it asserts an underlying claim that supports a request for injunctive relief.  Interpreting the allegations in the complaint in Shriners' favor, we find two possible claims.  First, despite counsel's arguments in the briefing on the motion to dismiss, the complaint itself repeatedly refers to Ordinance No. 995 as an unconstitutional bill of attainder.[12]  (*See, e.g.*, Doc. No. 15-2 at p. 7 ¶ 7, p. 12 ¶ 27, p. 15 ¶ 38.)  Second, in Count II, Shriners contends that the ordinance

---

[12] A close review of Shriners' response brief also shows that, while Shriners disavows any constitutional cause of action, it continues to argue that Ordinance No. 995 amounts to a bill of attainder.  (*See* Doc. No. 8 at p. 12–13 ¶¶ 29–32 (arguing that the ordinance "categorically singles out The LuLu Shriners and punishes Plaintiff through the fiction created by members of PETA that elephants have ever been abused at the LuLu Shriners Circus or that these same well-trained and performing animals are a danger to the public").)

tortiously interferes with its contract with Hamid Entertainment.[13]   Below we analyze whether Shriners has alleged facts sufficient to state a claim under either theory.

### A.     Bill of Attainder

Article I, § 9, cl. 3 of the Constitution provides that "no Bill of Attainder . . . shall be passed."   A bill of attainder is a "law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."   *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 468 (1977).   This definition can be broken down into three requirements:   "specification of the affected persons, punishment, and lack of a judicial trial." *Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 846–47 (1984).   Because we find that the first two requirements are not satisfied, we need not reach the third.

### 1.     Specification

First, we find that Ordinance No. 995 lacks the specificity needed to constitute a bill of attainder.   "In forbidding bills of attainder, the draftsmen of the Constitution sought to prohibit the ancient practice of the Parliament in England of punishing without trial specifically designated persons or groups."   *Selective Serv. Sys.*, 468 U.S. at 847 (quotation marks omitted). An individual or group is singled out when they are "called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Id.* (quotation marks omitted).

Here, Ordinance No. 995 does not mention Shriners by name, mention the Shriners' circus, point to a previous Shriners' circus, or even prohibit all circuses.   Instead, the ordinance

---

[13] In their motion, the Township Defendants also analyze whether Ordinance No. 995 violates the Contracts Clause or is an unconstitutional ex post facto law.   (*See* Doc. No. 2 at pp. 14–17.)   Because neither constitutional provision is implicated by the complaint, we do not address them in this Memorandum.

generally prohibits the future display of any wild or exotic animals in Whitemarsh Township whether that display is at Shriners' circus, another circus, or any other form of entertainment: "It shall be unlawful for *any person* to cause or permit the display of any wild or exotic animal on any public or private property within the corporate boundaries of Whitemarsh Township." Whitemarsh Twp., Pa., Code § 39-18 (emphasis added).  The ordinance thus lacks the specificity typically required of a bill of attainder.  *See United States v. Brown*, 381 U.S. 437, 461 (1965) (emphasizing that Congress is not prevented from "weed[ing] dangerous persons out of the labor movement," but it "must accomplish such results by rules of general applicability" and it "cannot specify the people upon whom the sanction it prescribes is to be levied"); *see also Shenandoah v. Halbritter*, 366 F.3d 89, 92 (2d Cir. 2004) ("[T]he terms of the Ordinance apply to all residents of the territory at issue, and cannot be said to single out any individuals.  Petitioners have not shown that the housing ordinance is a bill of attainder."); *Gilarno v. Borough of Freedom*, No. 2:10–cv–71 , 2010 WL 1643618, at *8 (W.D. Pa. Apr. 22, 2010) (finding that an ordinance was not an unlawful bill of attainder because "it does not contain the requisite specific designation, but applies broadly by its terms to 'any person'").

Shriners argues that the ordinance nonetheless singles out Shriners because it is the only entity in the Township that hosts a circus with wild and exotic animal displays and was the only entity specifically discussed during the Township meetings.  (Doc. No. 15-2 at p. 9 ¶ 6.)  Even taking these facts as true, however, they do not turn a rule of general applicability into an unlawful bill of attainder.

For example, in *Recreational Developments of Phoenix, Inc. v. City of Phoenix*, the District Court for the District of Arizona considered challenges to an ordinance which regulated "live sex businesses."  83 F. Supp. 2d 1072, 1076 (D. Ariz. 1999).  Specifically, the ordinance

declared that "[t]he operation of a business for purposes of providing the opportunity to engage

in, or the opportunity to view, live sex acts is declared to be a disorderly house and a public

nuisance per se which should be prohibited." *Id.* at 1077.  Owners of clubs affected by the

ordinance filed suit, arguing that the ordinance was a bill of attainder. *Id.* at 1078.  The district

court disagreed.  It found that although the City "drafted the ordinance in response to activities

that were allegedly taking place in [Plaintiffs'] clubs . . . the ordinance is merely a generally

applicable law proscribing a specified type of conduct." *Id.* at 1098.  Notably, the ordinance

"does not mention Plaintiffs by name, nor does it limit its application to Plaintiffs or deny them

the opportunity to conform their conduct to the new ordinance" in the future. *Id.*  "The

ordinance is thus markedly different from statutes found to constitute bills of attainder." *Id.*; *see*

*also Cathy's Tap, Inc. v. Village of Mapleton*, 65 F. Supp. 2d 874, 881 (C.D. Ill. 1999) (finding

that an ordinance regulating alcohol licenses was not a bill of attainder because although there

were only two licensees at the time it was enacted, it was an ordinance of "general applicability,"

which "not only affects [the plaintiff] and the other licensee, but [also] other business interests in

Mapleton that may, in the future, decide they want to obtain a license for the sale of alcohol").

Similarly, here, Ordinance No. 995 provides a generally applicable prohibition that gives

Shriners the opportunity to conform its conduct to the ordinance's restrictions.

Although we recognize, as did the Township Board of Supervisors, that Ordinance No.

995 is particularly burdensome for Shriners, that alone does not mean that the ordinance

unconstitutionally targets Shriners. *Cf. Nixon*, 433 U.S. at 470 ("By arguing that an individual or

defined group is attain[ ]ed whenever he or it is compelled to bear burdens which the individual

or group dislikes, [the plaintiff] removes the anchor that ties the bill of attainder guarantee to

realistic conceptions of classification and punishment. . . . [This] view would cripple the very

process of legislating, for any individual or group that is made the subject of adverse legislation can complain that the lawmakers could and should have defined the relevant affected class at a greater level of generality.").

### 2.    *Punishment*

In addition to lacking the necessary specificity, we find that Ordinance No. 995 does not inflict "punishment" in the constitutional sense.  *See Selective Serv. Sys.*, 468 U.S. at 851 ("The proscription against bills of attainder reaches only statutes that inflict punishment on the specified individual or group.").  In deciding whether a legislative enactment inflicts punishment, the Supreme Court recognizes three "necessary inquiries," for the reviewing court:  (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a congressional intent to punish."  *Id.* at 852 (quotation marks omitted); *see also Nixon*, 433 U.S. at 473–84.  Ordinance No. 995's prohibition on the display of wild and exotic animals is not "punishment" under any of these tests.

First, the ordinance does not fall within the array of punishments historically recognized as falling under the English bill of attainder or the related bill of pains and penalties:  death, imprisonment, banishment, or the punitive confiscation of property.  *See Nixon*, 433 U.S. at 473–74; *see also Selective Serv. Sys.*, 468 U.S. at 852 ("At common law, bills of attainder imposed the death penalty; lesser punishments were imposed by bills of pains and penalties.  The Constitution proscribes these lesser penalties as well as those imposing death.").  In the United States, courts have expanded this list to include legislation that bars individuals from participation in a specific employment or vocation.  *Nixon*, 433 U.S. at 474; *Selective Serv. Sys.*,

468 U.S. at 852.  Ordinance No. 995, which merely prohibits the display of wild or exotic animals, imposes none of these burdens.

Second, under the functional test, we must consider whether the ordinance, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475–76.  "Where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Id.* at 476.  In this case, it is clear that the Township Board of Supervisors had legitimate purposes for enacting Ordinance No. 995.  In each of the three meetings where the supervisors discussed the ordinance, individual supervisors and members of the public emphasized that the ordinance was meant to protect animals and the public from the negative consequences of traveling wild and exotic animal displays.  The text of the ordinance also lists these non-punitive goals.  *See* Ordinance No. 995, Whitemarsh Twp., Pa.; *see also Nixon*, 433 U.S. at 476–77 (emphasizing that the legitimate "objectives are stated in the text of the Act itself").  Because the Board of Supervisors had "legitimate legislative purposes" for passing Ordinance No. 995, the Court finds under the functional test that it was not passed for the purpose of punishing Shriners.

Last, we find that Ordinance No. 995 does not inflict punishment under the motivational test.  Under this final test, the Court looks to "whether the legislative record evinces a congressional intent to punish." *Nixon*, 433 U.S. at 478.  Here, we find that the Township meeting records indicate no intent to punish Shriners for hosting circuses in the past.  Instead, the ordinance is a proactive measure, meant to protect the public and exotic animals in the future. *See A Helping Hand, LLC v. Baltimore County*, 299 F. Supp. 2d 501, 504 (D. Md. 2004) ("Finally, while the County Council's motivation may have been improper under the Americans

with Disabilities Act, there is no evidence that it was punitive, considering, once again, that the law aimed to regulate future activity rather than penalize past actions.").  Indeed, during the January 6th meeting in particular, Supervisor Drossner emphasized that the ordinance was not directed toward Shriners' circus but was meant to limit the potential for future harm to the public.

Shriners makes much of the fact that the supervisors had no evidence of past abuse or public harm by any animals at its circus.  But if anything, this strengthens the argument that the ordinance was not meant to punish Shriners for past actions.  *Cf. Nixon*, 433 U.S. at 480 (explaining that the "absence from the legislative history of any congressional sentiments" either of "moral blameworthiness or punishment" is "probative of nonpunitive intentions and largely undercuts a major concern that prompted the bill of attainder prohibition:  the fear that the legislature, in seeking to pander to an inflamed popular constituency, will find it expedient to openly assume the mantle of judge or, worse still, lynch mob").

For those reasons, we find that Ordinance No. 995 lacks the specificity and the punitive aim necessary for a bill of attainder.  Therefore, this claim cannot support Shriners' request for injunctive relief.

### B.      *Tortious Interference with Contracts*

We turn next to Count II and analyze whether the complaint states a claim for tortious interference with contracts.  Under Pennsylvania law, to state a claim for tortious interference with existing contractual relations, Shriners must allege facts tending to show:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct.

19

*Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009). Defendants

focus on the third element, arguing that their actions in drafting and passing Ordinance No. 995

were privileged, and therefore, the tortious interference claim fails.[14]  We agree.[15]

Although "some jurisdictions consider a justification for a defendant's interference to be

an affirmative defense, Pennsylvania courts require the plaintiff, as part of his prima facie case,

to show that the defendant's conduct was not justified." *Acumed LLC*, 561 F.3d at 215 (quoting

*Triffin v. Janssen*, 626 A.2d 571, 574 n.3 (Pa. Super. Ct. 1993)); *see also East Rockhill Township*

*v. Richard E. Pierson Materials Corp.*, 386 F. Supp. 3d 493, 502 (E.D. Pa. 2019) ("In

Pennsylvania, the plaintiff must demonstrate a lack of privilege or justification as part of the

prima facie case, and failure to do so results in dismissal of the claim.").  There are "few reported

cases discussing privilege in the context of tortious interference with contract suits against

governmental officials," but when "the challenged action involves the exercise of regulatory

power," as it does in this case, "privilege becomes a central consideration." *East Rockhill*

*Township*, 386 F. Supp. 3d at 502.

"To establish an absence of privilege or justification, a plaintiff must show not only that a

defendant acted intentionally to harm the plaintiff, but also that those actions were improper,"

---

[14] Defendants also argue that the complaint fails under the second element because Shriners does not allege that Defendants knew about the contract with Hamid Entertainment, let alone that they intended to harm Shriners' contractual relationship.  And in the alternative, Defendants argue that they are immune from suit for this claim under the PSTCA.  We need not address these additional arguments because we find the complaint fails to allege any facts that suggest Defendants' actions were improper.

[15] In the alternative, we find that Shriners failed to substantively address this argument in its briefing on either motion.  We could, therefore, accept Defendants' argument as uncontested and dismiss Count II without additional discussion.  *See, e.g.*, *Ghoubrial v. Johanns*, Civil Action No. 05-CV-04256, 2006 WL 8459472, at *2 n.6 (E.D. Pa. Sept. 29, 2006) ("[P]laintiff filed a response but did not address the sovereign immunity argument made by the United States.  The motion to dismiss by the United States could, therefore, be granted as uncontested."); *Bowser v. Bogdanovic*, No. 08-cv-847, 2010 WL 1462548, at *5 (M.D. Pa. Apr. 9, 2010) ("We note that, as a matter of course, the Court could dismiss Plaintiffs' claims because Plaintiffs failed to respond to the arguments for dismissal of those claims set forth in the Defendants' Brief in Support of the instant Motion.").

under the factors outlined in § 767 of the Restatement (Second) of Torts. *Id.* at 503 (quotation marks omitted); *see also Windsor Secs., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 663 (3d Cir. 1993) (describing the "privilege" element of the cause of action as requiring that the plaintiff show "the impropriety of the interference"); *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000) ("Pennsylvania has expressly adopted the Restatement (Second) of Torts, which states that a necessary element of this tort is improper conduct by the alleged tortfeasor."). Those factors are (1) "the nature of the actor's conduct," (2) "the actor's motive," (3) "the interests of the other with which the actor's conduct interferes," (4) "the interests sought to be advanced by the actor," (5) "the social interests in protecting the freedom of action of the actor and the contractual interests of the other," (6) "the proximity or remoteness of the actor's conduct to the interference," and (7) "the relations between the parties." Restatement (Second) of Torts § 767; *see also Windsor*, 986 F.2d at 663 ("In determining whether an actor's conduct is 'proper,' Pennsylvania courts are guided by the following factors derived from the Restatement (Second) of Torts § 767[.]").

Applying those factors here, we find that the complaint fails to allege the absence of privilege or justification on the part of Defendants. The first factor, the nature of a defendant's conduct, is a "chief factor in determining whether the conduct is improper or not." *Windsor*, 986 F.2d at 663 (quoting Restatement (Second) of Torts § 767 cmt. c). Here, Defendants' conduct involved drafting and passing a generally applicable ordinance to ensure the public's safety and protect wild animals from abuse. Drafting ordinances at the behest of the Board of Supervisors is the duty of the Township Solicitor, *see* 53 Pa. Stat. § 66103, and passage of those ordinances is a lawful and valid use of the Board's regulatory authority, *see East Rockhill Township*, 386 F. Supp. 3d at 503 (finding that the first factor weighed in favor of the township defendants because

the court could "not conclude that it was improper for Township officials to explore the limits of their regulatory authority").

In addition, there is no allegation that Defendants' actions amounted to an independent tort, deprived individuals of their civil rights, or violated applicable ethical codes. *See Windsor*, 986 F.2d at 664 (distinguishing cases that "involve innately wrongful conduct such as torts, deprivation of civil rights, and violation of ethical codes" and finding that "[b]ecause there is no evidence that Hartford's conduct was wrongful by any measure external to the interference itself, we conclude that Hartford's conduct was not wrongful"); *Crivelli v. Gen. Motors Corp.*, 215 F.3d at 395 (Comment c to the Restatement (Second) of Torts "gives illustrative examples of improper conduct actions, such as threats of physical violence, fraudulent misrepresentations, threats of unmerited civil or criminal litigation, economic pressure, and unlawful conduct. The conduct Crivelli attacks by its tort claim, GM's decision to exercise its right of first refusal, is not comparable to any of those examples and, as we have just decided, violated no statute, regulation, or governing judicial decision" (internal citations omitted)). Therefore, the first factor weighs in favor of finding Defendants' actions justified or privileged.

Under the second factor, we find nothing improper in Defendants' assertion that they passed the ordinance to address many years of complaints by concerned citizens and to ensure the public safety and animal welfare. *See East Rockhill Township*, 386 F. Supp. 3d at 504 (concluding under the second factor that the court could "not fault government officials for responding to constituent concerns"). For similar reasons, the fourth factor (the interests sought to be advanced by Defendants) weighs in favor of finding Defendants' actions justified. In addition, the first half of the fifth factor (the social interests in protecting the freedom of Defendants' actions), weighs in favor of finding no improper motive because the public has a

strong interest in ensuring the Township's leaders are free to listen to citizen concerns and to draft and pass legislation that addresses those concerns, especially when they involve matters of public safety.  *See id.* (explaining that the fourth and fifth factors are connected to the second, and concluding that "the Township officials have a strong interest in advocating for the community's well-being and giving voice to local residents' views on land use policy" and the "officials' freedom to serve their constituents without fear of repercussions . . . is of great social utility").  Finally, under the sixth factor (the proximity or remoteness of Defendants' conduct to the interference), we find that the ordinance's generally applicable ban on exotic animals is remote to the contract between Shriners and Hamid Entertainment.  The Township is not a party to the contract; there is no allegation that the supervisors knew about the contract; there is only one year remaining in the contract; and Hamid Entertainment can meet many of its contractual obligations without offending the ordinance.

It is true that Shriners and the public have an interest in protecting Shriners' right to contract.  *See id.* (finding under the third Restatement factor that there is a "social interest in protecting [the plaintiff's] contractual rights" and under the second half of the fifth factor that the plaintiff has an "interest in reaping the benefits of his contract").  However, these interests do not outweigh Defendants' and society's significant interest in having a local government regulate areas important to the public health and safety of its citizens.  *Id.* ("By definition, regulatory actions taken by governmental officials will impact the commercial activities of those subject to such regulation.  Courts should therefore exercise caution before attaching tort liability to the decision-making process of such officials.").

Having weighed the Restatement factors, we hold that the complaint fails to allege any facts from which we could find that any of the Defendants acted without privilege or

justification.  *See id.* ("After balancing all of the Restatement factors, I conclude that the allegations set forth in the Counterclaim do not suffice to establish the Township officials acted improperly.").[16]  Because Shriners has not alleged that Defendants acted improperly and without justification, it fails to state a claim for tortious interference with contractual relations, and we dismiss Count II.  And because Shriners' underlying claims fail as a matter of law, we find that it is not entitled to injunctive relief and also dismiss Count I.

## V.     *Conclusion*

Defendants' motions to dismiss are granted, and the complaint is dismissed with prejudice.[17]

---

[16] We find that the seventh Restatement factor (the relations between the parties) is neutral.

[17] Shriners has not requested an opportunity to amend its complaint, and the Court is not compelled to *sua sponte* allow amendment in non-civil rights cases.  *See Corsale v. Sperian Energy Corp.*, 819 F. App'x 127, 131 (3d Cir. 2020) ("The plaintiffs did not properly request leave to amend here, and so the District Court did not abuse its discretion in not granting leave to amend sua sponte."); *N.E. Revenue Servs., LLC v. Maps Indeed, Inc.*, 685 F. App'x 96, 102–03 (3d Cir. 2017) ("Because this is not a civil rights case, the District Court was not required to *sua sponte* offer amendment.").  In addition, we find that amendment is particularly unwarranted in this case because Shriners failed to substantively respond to many of Defendants' arguments in its briefing on the motions to dismiss.  *See, e.g.*, *Jones v. Brouse*, CIVIL NO. 3:15-CV-0680, 2016 WL 1242347, at *4 (M.D. Pa. Mar. 30, 2016) ("Because plaintiff has failed to oppose the motion to dismiss, granting leave to amend would be futile.").  And even if we were to overlook these procedural deficiencies, a review of the text of Ordinance No. 995 and the recorded Board meetings shows that any amendment would almost certainly be futile.  *See Heyl & Patterson Int'l, Inc*, 663 F.2d at 425 (explaining that denial of a motion to amend must be grounded in "substantial or undue prejudice" to the opposing party, or "in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment"); *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) ("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.").